**PACIFIC STATES STEEL CORPORATION, a corporation, and American Forge Co., a corporation, Appellants and Appellees,**

**v.**

**ISAACSON IRON WORKS, a corporation, Appellee and Appellant.**

**No. 18300.**

United States Court of Appeals Ninth Circuit.

July 6, 1963.

Fitzgerald, Abbott & Beardsley, Edward B. Kelly, and Philip M. Jelley, Oakland, Cal., for appellant.

J. P. Vukasin, Jr., Oakland, Cal., for appellee.

Before BARNES and MERRILL, Circuit Judges, and TAVARES, District Judge.

BARNES, Circuit Judge.

This is a diversity action between corporations. Appellee is incorporated in and has its principal place of business within the State of Washington. Appellants are incorporated in and have their principal place of business within the State of California. The matter in controversy exceeds exclusive of costs and interest, the sum of $10,000. 28 U.S.C. § 1332. Jurisdiction on appeal rests on 28 U.S.C. § 1291.

This also involves a cross-appeal. Plaintiff below, Isaacson Iron Works (here both appellee and appellant) will be referred to as "plaintiff" or "Isaacson." Pacific States Steel Corporation and American Forge Company (here both appellees and appellants) will be referred to jointly as "defendants," and

individually as "Pacific" or "Forge," respectively.[1]

Plaintiff sued in Count I on an open book account, and in Count II on an account stated.[2] Defendants counterclaimed for an offset, charging defective merchandise was delivered.

It seems clear (and it was stipulated between the parties) that California law applied.

Plaintiff forged, fabricated and manufactured steel. Defendant Forge manufactured and processed steel. From 1952 on, plaintiff sold some $886,000 worth of steel to Forge, up to January 1958. In 1955, an analysis of this account, made by plaintiff, disclosed a higher proportion of rejections by defendants of plaintiff's products, as allegedly defective, than claimed by other customers. In November 1955, Isaacson refused to sell to defendants a particular type of steel (known as C–1040) except on a "without recourse" basis. Just what the two parties believe "without recourse" means will be hereafter developed.

The dispute here involves six purchase orders; three for "C–1040 type" steel, and three for non 1040 or "alloy" steel.[3] The latter type was not sold on a "without recourse" basis.

## I—THE COURT'S FINDINGS

(a) That the C–1040 steel purchases here involved were by defendants from plaintiff on the specific term: "subject to acceptance without recourse based on ultrasonic inspection by Isaacson." The trial court found that such purchases were so made, and made with the additional understanding that defendants waived any and all right to any and all claims for defective merchandise, except "pipe or slag." (Finding 11.) The plaintiff disputes this exception, claiming the C–1040 steel was sold "as is."

"Pipe" is steel with holes or bubbles in it. "Slag" is foreign material found within steel.

Forge did not use the steel delivered to it immediately. In certain instances, when attempting to later put this delivered steel to use, it allegedly discovered the steel to be of non-forging quality, and useless save for scrap.

(b) That plaintiff's ledger sheets (Ex. 1) constituted an open book account; that defendants became indebted to plaintiff for items furnished from November 1, 1957 to January 30, 1958 (save the last six items dated December 31, 1958); that the unpaid balance was $13,023.77; that this had been demanded and was unpaid. (Findings 5, 6 and 7.)

(c) That there was no account stated between plaintiff and Defendant Forge on April 31, 1957, for $56,449.77, or on January 31, 1958, in the sum of $28,-402.75. (Findings 8 and 9.)

(d) That defendant Forge *was* entitled to an offset in the sum of $323.73 for authorized expenditures. (Defendant's Purchase Order 1929; Plaintiff's Invoice 9403. Finding 10.)

(e) That defendants were entitled to an offset of $5,101.38 for C–1040 steel purchased (P.O. S–893; Plaintiff's Inv. 9868(b)) because of "pipe" in said steel. (Finding 12.)

(f) That defendants *were not* entitled to offsets with respect to:

| (1) Defendants' P.O. | S–744 | Plaintiff's Inv. | KK7434–A |
|---|---|---|---|
| (2) " " " | S–745 | " " | KK7435 |
| (3) " " " | S–5110 | " " | LL4011–B |
| (4) " " " | S–4508 | " " | LL9401 |

1. These corporate defendants were merged prior to trial.

2. Count II was dismissed on motion of defendants and judgment was ordered for plaintiff in Count I alone.

3. C-1040 steel was described by defendants' expert metallurgist as carbon steel, the "10" referring to carbon and the "40" to the chemical percentage of the carbon; thus C-1040 steel has a "carbon chemistry" of $\frac{4}{10}$ of 1%.

(Findings 13–16, inclusive.)

(g) That plaintiff was not entitled to interest from January 30, 1958 to date of judgment on the portion of the book account not offset by defendants' counterclaim.[4]

The Conclusions of Law awarded plaintiff $13,023.77, less $5,425.13 or $7,598.-64 net.

## II—FORGE'S APPEAL

### A. *Questions Raised*

Appellant Forge raises the following questions:

1. Was there an open book account?

2. Does the plaintiff rely on so-called "disputed" or "undisputed" items of the account?

3. Did the court err in casting the burden of proof on defendants with respect to "disputed" items, requiring them to be raised by counterclaim?

4. Was the ultrasonic inspection of the C–1040 items (and *proof* thereof) a condition precedent to recovery on such items?

5. Was there error in the court failing to find upon the chemical specifications for the C–1040 steel?

6. Was there error in failing to find on Purchase Order S–745, in the sum of $1,900.51, in view of the special agreement to settle this dispute?

Appellant Forge raises four other general "basic questions" as to the findings (whether they are clearly erroneous, sufficiently explicit, binding on this court if based on documentary evidence, binding on this court if erroneous in law, and finally a fifth: "the effect of plaintiff's failure to produce [certain] key witnesses").

Plaintiff Isaacson agrees upon the six legal questions above presented, but prefers to frame them in different language.[5] It also raises a different basic question: "How can a seller, after experiencing an inordinately large amount and number of claims from a buyer, protect himself from such unjustified claims if the buyer is not bound by the terms of an agreement between the parties calculated to prevent this very abuse?"

### B. *Was There an Open Book Account?*

Defendant Forge first recognizes the force and validity of Rule 52(a) of the Federal Rules of Civil Procedure. That general rule is inapplicable, however (urges Forge), (a) if the reviewing

---

4. This was not an affirmative finding, but inferentially arises from the court's striking of the provision for interest—both from Finding 17 and the Judgment—as originally prepared.

5. "*Question 1:* Is there sufficient evidence in the record to support the Trial Court's finding that 'Plaintiff's Ledger Account * * * is an open book account'?

"*Question 2:* Is there sufficient evidence in the record to support Isaacson's pleadings and consistent position during trial that its First Count was for the unpaid balance due on its open book account. Or, to phrase it from the opposite viewpoint, is there a scintilla of evidence in the record that Isaacson was suing on anything else other than the unpaid balance, in its Count based on the open book account?

"*Question 3:* Is there any basis in law or in applicable rules of evidence which would have justified or allowed the Trial Court to cast upon Plaintiff the burden of proving facts not set forth in its pleadings, not related to its position in court and introduced into the case for the first time by the Defendants?

"*Question 4:* Is there sufficient evidence in the record to support the Trial Court's Findings of Fact No. 13 (Trans. p. 26, lines 4–9) and No. 15 (Trans. p. 26, lines 18–23), both of which were in favor of Appellee Isaacson and against Appellant Forge on whom the burden of proof rested?

"*Question 5:* Did Defendants prove, with sufficient evidence to carry the burden of proof, that they were entitled to an off-set on grounds of chemical specifications?

"*Question 6:* Did Defendant prove with sufficient evidence to carry the burden of proof that there was in fact any *special agreement* between the parties regarding Purchase Order S–745 and Invoice No. 7435 and if any such *special agreement* did exist, did Defendants prove with sufficient evidence to carry the burden of proof that it was settled in favor of Defendants?"

court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed; (b) where the finding largely rests on documentary evidence; (c) where the finding is induced by an erroneous view of the law. These are all sound legal principles, and we reaffirm them. The problem is whether they are, singly or jointly, here controlling.

An open book account, urges Forge, did not exist here, because the ledger sheets do not set forth "the requisite of the history of the transaction," or "a detailed statement"; hence, are allegedly fatally defective.

█ The extent of what need and need not be shown on an open book account is largely, as in so many evidentiary matters, a matter of degree, the determination of which is a matter lying within the judicial discretion of the trial judge.

California Code of Civil Procedure, Section 337a, was admittedly added in 1959,[6] and was not retroactive in effect, but both parties agree it merely codifies the pre-existing case law of California on the subject. Agreeing on the law, Forge urges there was "insufficient history of the transaction," no "detailed statement," nothing to show the "nature of the transaction." It quotes from Tillson v. Peters, 1940, 41 Cal.App.2d 671, 107 P.2d 434, with partisan emphasis (its own italics underscored):

> *"The books contain no history of the transaction of the leasing of the ranch under which the installments of rental were paid. Neither the nature or amount of the original indebtedness, nor any unpaid installments of rental were entered in the books. The book entries did not purport to record the nature of the transaction, nor the debits and credits of the respective parties."*

Plaintiff Isaacson, with the same partisan assurance, urges that its ledger cards "meet *every* requirement of that Code section," and specify the detail.[7]

6. That Section is worded as follows:
"['BOOK ACCOUNT.'] The term 'book account' means a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonable permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonable permanent form and manner." (Added by Stats.1959, Ch. 1010, § 1.)

7. "a) Plaintiff's ledger cards (Pl's. Ex. 1) are a 'detailed statement'. Each and every separate credit and debit transaction, of every nature is separately stated and entered thereon, with date, identifying number of invoice, credit memo or debit memo, amount of debit or credit and resulting balance (Pl's. Ex. 1).
"b) Plaintiff's ledger cards (Pl's. Ex. 1) constitute the 'principal record' of transactions between 'debtor' (Forge) and 'creditor' (Isaacson) arising out of their 'contracts' (purchase orders and invoices). The only direct testimony relating to these ledger cards was that of Roy C. Edenholm, Plaintiff's Office and Credit Manager (Trans. p. 77, lines 17–20). He stated that a running account of each account is kept on original ledger cards (Trans. p. 79, lines 9–12), that Plaintiff's Exhibit 1, contains the original ledger cards of Isaacson for the account of American Forge Co. of Niles, California, starting with September 25, 1953, through to the date of his testimony (Trans. p. 80, lines 13–20).
"c) Plaintiff's ledger cards (Pl's. Ex. 1) show the 'debits and credits connected therewith, and against whom and in favor of whom entries are made.' Edenholm's uncontradicted testimony is that Plaintiff's Exhibit 1 reflects all of the charges and credits granted and rendered from Isaacson to Forge during the period of time shown thereon (Trans. p. 81, lines 10–13).
"d) The entries on Plaintiff's ledger cards (Pl's. Ex. 1) were 'entered in the regular course of business'. Mr. Edenholm replied affirmatively when asked if Plaintiff's ledger cards were 'maintained in the ordinary course of business', if 'the financial transactions reflected on there [were]

The trial court thought, as we think, that the alleged open book account was a sufficiently "detailed statement, kept in a book, in the nature of debit and credit," (to quote Wright v. Loaiza, 1918, 177 Cal. 605, 171 P. 311), a case heavily relied upon by each side. And see the peculiar facts of Tillson v. Peters, supra, 41 Cal. App. at 677 and 678, 107 P.2d at 437 and 438. Further, we think the record here discloses such facts that an open book account could well have been implied from the conduct of the parties: that they had *agreed* that their various transactions "should be the subject of an account between them." Cf. Warda v. Schmidt, 1956, 146 Cal.App.2d 234, 303 P.2d 762. See also Costello v. Bank of America, N.T. & S.A., 9 Cir. 1957, 246 F.2d 807, 812; Parker v. Shell Oil Co., 1946, 29 Cal.2d 503, 507, 175 P.2d 838; Millet v. Bradbury, 1895, 109 Cal. 170, 41 P. 865.

■ We cannot see our way clear to hold on this issue the trial court was clearly erroneous, nor that it did utilize any erroneous theory of law, nor are we left with any firm or definite conviction that a mistake was committed by the trier of fact. The finding there was an open book account is not clearly erroneous.

C. *Was There a Mistake Made by the Court as to the So-Called "Disputed Items"?*

We think not, nor do we think it necessary to discuss this phase of the appeal in great detail. Paragraphs five and six of the first count of the first amended complaint plead an open book account. The defendant Forge urges two certain amendments (one made by order of court, Trans. pp. 365–6, line 20; Trans. p. 361, lines 14–16, upon motion of plaintiff unopposed by defendants ; the second made upon stipulation of the parties, Trans. p. 315, lines 2–25) "did not erase the controlling effect of earlier pleaded language." [8]

By such reasoning, defendants urge, so we understand, that the pleading of the open book account was defective and improperly sustained as to the burden of proof—that plaintiff established an open book account for so-called "undisputed items," but not for "disputed items." Defendants emphasize certain testimony that Edenholm (credit manager for Isaacson) "let slip" that the "disputed items" were not paid or settled, yet in the next breath, defendants quote his contrary testimony. This conflict is one of fact and credibility, for the trier of facts to decide. From Edenholm's testimony that he made entries on the ledger cards only when authorized by Mr. Isaacson, defendants maintain the entries in the account were "tentative" only; and that the monthly statements sent by plaintiff to defendant Forge could not be considered "demands" —thus sustaining there was no demand for the payment of the undisputed items appearing on the open book account.

Although appellants purport to quote in their brief *all* the relevant evidence on the subject of the open book account,[9] appellee points out ten "salient points" in the evidence omitted by appellants.[10] Some one or more of these points, at least, *are* salient and material.

made at or about the time of the event which they purport to record', if the 'ledger cards [were] prepared in accordance with the system that you [he] just described', and if 'all the entries on there [were] true and correct?' (Trans. p. 81, lines 14–25.)" (Isaacson's Br. pp. 11–12.)

8. This statement is supported in note 13 (Forge's Br. p. 26) by the statement that Rule 15(c) of the Federal Rules of Civil Procedure (which provides an amend-

ment "relates back" to the original pleading) is applicable *only* to "the filing of a complete 'amended pleading,'" citing two cases which do deal with complete amended pleadings, but do not lay down the proposition that the principle applies *only* to complete amended pleadings. And see Culver v. Bell & Loffland, Inc., 9 Cir. 1944, 146 F.2d 29, 31.

9. Defendants-appellants' Op.Br. pp. 27–34.

10. Plaintiff-appellee's Reply Br. pp. 22–24.

■ We agree with appellee that the finding an open book account existed, and the amount of it, is, despite some contrary evidence, fully, fairly and amply sustained by the evidence, and no improper shifting of the burden of proof was permitted.

D. *Were the Findings in Error With Respect to the Two C–1040 Steel Orders for Which Plaintiff Recovered? I. e., Was an Ultrasonic Inspection, and Proof Thereof, a Condition Precedent to Plaintiff's Recovery?*

■ We hold the findings were not in error, that the performance of *any particular kind* of an ultrasonic test was not a condition precedent; that even if we were to find that some ultrasonic test, as determined and established by the seller, was a condition precedent, that condition precedent had been complied with—*i. e.*, that there was sufficient substantial proof of such tests.

Though interspersed with argument, we quote as a fair summary of the record, in the margin, a portion of plaintiff's brief on the subject.[11] The best

---

11. "In July, 1955 (Trans. p. 1035, line 9; p. 1036, lines 13–14), Richard W. Hargis, Jr., Forging Sales Manager for Isaacson since 1947 (Trans. p. 1026, lines 17–23) advised Forge's General Manager (Spaich) and its Purchasing Agent (Thorpe) that from that date forward, Isaacson 'would accept orders only upon an *acceptance without recourse* basis' (Trans. p. 1038, line 22 to p. 1039, line 5), and would sell C-1040 steel to Forge only if Forge would 'accept the billets *"as is,"* and would waive any right to place a claim against it.' (Trans. p. 1040, lines 2–5). This demand by Isaacson resulted from a review of its prior sales to Forge and claims by Forge, which disclosed that Forge had a magnitude of claims, compared with other customers, to the extent that Isaacson's Forging Sales Manager questioned whether it was profitable to do business with Forge (Trans. p. 1031, lines 14–24). Hargis' examination disclosed that Forge's *claim ratio* (tonnage of claims as against tonnage sold) was *approximately twice as much as the customer with the next highest claim ratio* (Trans. p. 1031, line 25 to p. 1033, line 8). After this information was discussed and reviewed by Isaacson's Management (Trans. p. 1033, lines 17–18), a decision was reached as to the terms of future sales to Forge (Trans. p. 1034, lines 3–16), this decision was communicated to Forge's General Manager (Spaich) and its Purchasing Agent (Thorpe) as heretofore described.

"The true and uncontroverted nature and terms of the agreement between the parties is clearly set forth in the letter from Hargis to Forge, Attention Forge's General Manager Milo Spaich, dated November 18, 1955 (Pl's. Ex. 11) which reads in part as follows:

" 'Approximately two years ago we shipped some heavy 1040 billets to you which were to be made into crankshafting.

The difficulty encountered in producing your crankshafting resulted in quite a controversy between us, and in our finally allowing you quite a large credit. To prevent this from ever occurring again, we *refused to sell* you any billets of 1040 when we felt certain the end would be crankshafting, wherein torching and several other major factors entering into the proper handling of 1040 are disastrous, if not done in the proper manner. .

" 'We have your order #S-603 for two large crankshafting billets forged to shape and of 1040 steel. This order does not call for "Acceptance Without Recourse," and in the face of what has happened to your order S-525, *we now ask that you cancel this order* S-603 without cost to you, although one of these forgings is completely finished, including heat treatment, *unless* you change your order to read the same as the previous one—"Acceptance As Is Without Recourse." ' (Trans. p. 1044, to p. 1046.)

"Spaich's reply (to Hargis' letter of November 18, 1955) dated November 30, 1955 (Pl's. Ex. 12), confirms the testimony of Hargis when it says, 'We are cognizant of the fact that certain 1040 billets which you supplied to us were supplied on the basis of "Without Recourse",' and where it says, 'If your position, however, is to stand on the original terms to which the order was accepted, we have no alternative but to abide by your decision. * * *' (Trans. p. 1049, lines 3–6 and lines 16–19.)

"The nature of Isaacson's attitude toward Forge's claims, and its reaction to Forge's arbitrary and unauthorized deductions is amply described by Isaacson's curt demand that Forge 'clear up their account' and that 'any future sales would be on a C.O.D. basis.' (Trans. p. 1052, lines 3–9). The unreasonableness of Forge's position and Isaacson's deep concern and dissatisfaction with Forge's

that may be said for defendants' argument here is that it is based on negative factors (that Hargis did *not* testify as to ultrasonic tests; that Dahl, who performed the tests, was *not called* to testify; that Rodgers was *not present* when the tests were made, etc., etc.) This may attack the convincing effectiveness of the existing positive testimony that such tests were made, but it does not destroy it. Defendants' statement "there is no evidence of any [ultrasonic] inspection" simply is not a correct statement of fact.

E. *Was There Error in the Court's Failing to Find Upon the Chemical Specifications of C–1040 Steel?*

■ Defendants claim Finding 13 is in error (relating to Debit Memo 502, Def's Ex. D–3, and P.O. S–744, Def's Ex. R) for $3,135.02.

Here defendants-appellants' position is stated as follows:

"Defendants contend that Isaacson so greatly exceeded the chemistry requirements of the P.O., the steel supplied having a carbon content of .51 to .52, rather than .40 to .45 as ordered, that the steel was worthless except for scrap purposes and indeed was not C–1040 steel.

"The Court, however, was of the view that the 'without recourse' proviso precluded Forge from showing any defects in steel other than such as might be discovered by an ultrasonics inspection, to-wit, 'pipe' or slag, notwithstanding the fact the

claims is emphasized by the fact that Hargis in his twenty-six years with Isaacson, fifteen as Forging Sales Manager (Trans. p. 1026, lines 14–23), had *never* instituted or demanded such severe terms, on *any* other customer of Isaacson because of claim problems (Trans. p. 1052, lines 10–18), and the testimony of Rodgers, Isaacson's Forge Shop Superintendent (Trans. p. 718, lines 3–5), on cross-examination that he did not know of *any* other instance in which Isaacson imposed 'without recourse' requirements on *any* other customer (Trans. p. 781, lines 13–18).

"Thus it was clearly established, that it was the agreement and intent of the parties upon Isaacson's insistence and demand that Isaacson be absolved and released of *any* responsibility, that Forge purchased the steel involved on an 'as is' basis and 'waived any right to place a claim against it.' (Trans. p. 1040, lines 2–5).

"The ultrasonic test term terminology was introduced by Isaacson to insure in their own mind that they were shipping good steel (Trans. p. 1040, line 23 to p. 1041, line 10). That is, it was introduced by Isaacson as a self imposed check on themselves for their own purposes, even though they did not deem it necessary to conduct such tests on steel from which they themselves made crankshafts (Trans. p. 865, line 25 to p. 867, line 2). No specific or particular ultrasonic test or specific method of ultrasonic testing was requested or demanded by Forge, nor was any specific or particular test or method of testing agreed upon by the parties (Trans. p. 1041, lines 11–16). Forge presented no evidence that contradicted this direct testimony.

"Rodgers, Isaacson's Forge Shop Superintendent, testified that Isaacson had *one* standard of ultrasonic testing, which is applied to all material regardless of whether Isaacson intended to use it or it was being shipped to another user, that is to say, Isaacson did *not* have a better test for material which it intended to use and a poorer test for material which it sold to others (Trans. p. 865, lines 4–24).

"Despite Forge's statement to the contrary in its Brief, there *was* evidence of ultrasonic inspections. Rodgers testified, uncontradicted by Forge, that the C-1040 steel shipped to Forge *was submitted to the standard ultrasonic inspection conducted by Isaacson at that time, performed by his laboratory metallurgical department under his direction and control,* and that it consisted of preparation (rough grinding) of the billet, application of the testing fluid and scanning through either the flat surface or two adjacent sides of the billet (Trans. p. 867, line 25, to p. 872, line 3).

"Forge presented *no evidence* that an ultrasonic test had not been performed at and by Isaacson, in fact Forge admitted that *all* of the C-1040 steel received by it had the 'rough grinding' that accompanies an ultrasonic test (Trans. p. 540, line 21 to p. 541, line 3; p. 566, lines 14–19; p. 583, lines 8–13)." (Isaacson's Br. pp. 27–31.) (Emphasis by Isaacson.)

Court expressly recognized that an ultrasonics inspection would not show chemistry deficiencies or excesses and notwithstanding the further fact that nothing done by Forge could alter the chemical content of the steel as furnished by plaintiff. Thus, the Court stated that the 'non-recourse' language would permit defendants *only to go into that aspect of defects which would have been shown by ultrasonic tests.* Since the ultrasonic tests would not have disclosed chemistry, the Court opined any complaint as to chemistry was precluded by the 'no recourse' language: that with regard to chemistry, that is just what the 'no recourse' meant; as to chemistry, the 'without recourse' provision is a limitation (p. 1081, line 12 to p. 1087, line 12.)" Appellants' Brief, pp. 39–40. (Emphasis by appellants.)

We find no merit in this because we find no condition precedent existed, other than ultrasonic inspection. We need not consider the plaintiff's argument as to the number and effect of heat operations applied to the steel after delivery,[12] or the integrity of the tests.[13] The evidence was conflicting as to the chemical nature of the steel delivered. We will not disturb the trial court's determination.

Finding 15, covering the C–1040 steel item of $817.09, which the court would not allow as an offset, is next attacked.

This finding by defendants' specific admission (Opening Br. p. 45) rests on disputed evidence. To quote defendants' expert witness' testimony in detail, and next characterize the contradictory testimony of plaintiff's witness as "weak," actually graphically portrays the weakness of defendants-appellants' position on this point.

■ F. We come to the sixth question—the findings of the court [14] that de-

fendants had failed to prove their right to offsets with respect to alloy steel (Debit Memo 503; P.O. S–745 for $1,-900.57; and Debit Memo 201, P.O. S–5408 for $1,746.02—Def's Exs. D–2, AA, D–5 and AD, respectively).

On the first of these items—the rejected billet was returned to Isaacson because of cracks. Tests were made to determine their cause. Hargis (for plaintiff) reported the acid-etched macro-sample produced a picture which indicated a great number of bursts originating from the center as well as the outside, which indicated a "tremendous thermal condition must have occurred"—i. e., blaming the condition found on the heating procedures used by Forge. Forge insisted it had placed the 12′ to 15′ long, 24″ square billet, only five feet into the furnace; i. e., that the crack outside the portion not put in the furnace must have been due to an inherent defect in the steel.

On September 18, 1957, there was an oral agreement that plaintiff was to make another "macro-etch" *towards* the tonghold; and if it showed the same defect as the first macro-etch, this would substantiate Forge's position, and if it showed no defect, it would support Isaacson's position.

This oral agreement, says Forge, was confirmed by a letter dated October 29, 1957 (Defendants' Exhibit 1). This letter is self-explanatory, and reads:

"On September 18, 1957, Ed Rodgers and the writer visited you, Jerry Thorp, Walt Riddle and Claude Roberts at Niles. During the discussion about subject billet, it was agreed that we were to make another macro etch *towards the tong hold.* If this second etch *(beyond zone subject to any heat)* were in the *same condition* as original picture submitted with our letter of 9/9/57, then Isaacson Iron Works would acknowledge your claim; but if not, then American Forge Company would withdraw the claim (Debit 503).

12. Tr. p. 706, lines 17–21; p. 707, lines 12–13; p. 576, lines 23–24.

13. Tr. p. 708, lines 19–22.

14. Findings 14 and 16.

"In our letter of 9/9/57 we stated that the original macro etch was taken in that portion 'just beyond the point where the furnace door was' *which is in error*, rather the *macro was 18" away from tonghold.* The second macro etch is taken in the center of the tonghold (photo enclosed) and shows good material." (Emphasis appellants'.)

"It is conclusive," says Forge, "that if the earlier picture in reality * * *

had been taken of a 'cut' or sample from the unheated portion, *i. e., toward the tonghold* a portion * * * [of] the defect would have been shown to have existed in the unheated portion of the billet." This assumes, of course, that the billet was of sufficient length *to possess an unheated portion.* The length of the billet was thus critical.

Isaacson's answer to this is set forth in the margin.[15] It points out that while *two* macro-etch photos were placed in

15. "The testimony of Forge's main witness, Metallurgist Riddle, was vague and self-contradictory on a crucial point. On direct examination he testified that the piece of steel in question was '15 feet long, 12 or 15 perhaps.' (Trans. p. 613, line 8), whereas on cross-examination he testified that he did not know how long it was and did not know if there were one or two billets in that order, he *thought* there were two, and assuming there were two of approximately equal size they would each be approximately *ten feet long* (Trans. p. 671, line 9 to p. 672, line 2). This is critical because if 5 feet of the billet was in the forging furnace (Appts.' Opening Br. p. 46), then there was only five feet extending out of the furnace, and if the heat from the forging furnace and the gas hose raised the temperature of that portion of the billet that extended outside of the furnace for *three feet*, to 800 degrees (Trans. p. 613, lines 21–24), then there are only two feet of billet left, which also must have been affected by this heating and cooling performed by Forge, thus the entire billet received and was affected by Forge's improper handling and heat treating. This refutes and virtually smashes the basis of Appellants' argument, i. e., that the billet had not been heated by Forge at a place 18 inches from the tonghold (Trans. p. 626, lines 18–19), which, measuring from the other direction would be 6 inches from where the billet was, by Riddle's own testimony, 800 degrees hot.

"Appellants' own witness, Riddle, testified that a visual examination of the billet was conducted upon receipt of the billet, that no defect was observable or detected at that time, that the crack appeared and became visible *only after* being handled and heat treated by Forge and this longitudinal crack developed in that portion of the billet that was just immediately adjacent to the door, i. e., which reached a temperature of 1500 degrees (Trans. p. 615, lines 16–18; p. 613, lines 21–23).

"The only direct, eyewitness testimony of this question, is that of Isaacson's Forge Shop Superintendent, Rodgers, who testified without equivocation that he saw the unused portion of the billet returned by Forge and that he *examined* it personally (Trans. p. 723, lines 17–23), that he *instructed* the 'Lab Department' to take two cross-sections of the billet, one next to the furnace which he identified as 'X' section, and another 18 inches from the tonghold (Trans. p. 726, line 4 to p. 727, line 5). Rodgers' direct, unvarying, unyielding testimony, was that the picture attached to Defendants' Ex. AC accurately portrayed the internal conditions of that billet at a section 'next to the furnace' and that that condition could not have arisen if this piece of metal had not been raised to forging temperature (Trans. p. 720, line 23 to p. 730, line 8), and that the picture portrayed tremendous thermal bursts which occur if precautionary measures are not taken to prevent it (Trans. p. 730, lines 17–23).

"In their argument, Appellants state that ' * * * Isaacson never performed the agreement to settle by taking an etch of a portion toward the tonghold for comparison with the original picture.' (Appts.' Opening Brief pp. 50–51). Appellants' attention is directed to Trans. p. 733, line 8, to p. 734, line 5, where Mr. Rodgers testified that, under his instruction, a section was, in fact, taken 'approximately 18 inches from the tonghold, and that the picture identified as Defendants' Exhibit 1 represents a cutout of the tonghold and that no defects were disclosed therein.', supporting Isaacson's position, that the portion of the billet not subjected to heat by Forge was not defective.

In summary, Rodgers' direct testimony of his own observations proves that the portions of billet closest to Forge's furnace disclosed tremendous thermal bursts, the portion farther away (i. e.

evidence, *three* were testified to and about.

Suffice it to say, we must conclude there was a conflict in the evidence from which the trier of fact made a determination. His findings are supported by substantial and ample evidence, which we are not authorized to disturb.

G. With respect to Finding 16, no comment is required by this court to find support for it. Appellants agree "the witnesses on both sides did not take too positive a position as to the cause of the crack." Defendant-appellant Forge did not carry its burden of proof raised by its counterclaim.

As to all questions raised by defendants-appellants Pacific and Forge, the judgment of the court below is *affirmed*.

### III—ISAACSON'S APPEAL

Three specifications of error are relied on by plaintiff-appellant, which are presented in the following questions:

1. "Is Isaacson entitled to an award of interest from the date that payment was due until date of Judgment, on that portion of Isaacson's claim not offset by Forge's counterclaim?"

2. "Were 'pipe or slag' exceptions to Forge's waiver of all right to any claims for defective merchandise, when ordering C–1040 steel in 1956 on terms of 'subject to acceptance without recourse'?"

3. "Was there an account stated between Plaintiff and Defendant American Forge Co. on April 30, 1957, and was there an account stated between Plaintiff and Defendant American Forge Co. on January 31, 1958?"

#### A. *Interest*

The court below found the open book account sued on in Count I was $13,023.77; that this amount was "ascertainable and certain," but that the amount of the claimed offset was in dispute—though claimed at the same figure, $13,023.77.

We think the offset was as "ascertainable and certain," and to the same effect and degree, as the amount claimed on the open book account. Appellant Isaacson characterizes his open book account as "ascertainable"; the offset as "unascertainable." We think one as certain—and as ascertainable (subject to the wisdom of the trial court in allowing or disallowing each item of either) as the other.

When *a contract* is sued upon and an offset claimed, then one may well refer to the sum due under the contract as liquidated, and the offset as unliquidated. Hansen v. Covell, 1933, 218 Cal. 622, 24 P.2d 772, 89 A.L.R. 670. The parties to a contract have ascertained and specified the amount to be claimed when they enter into it—not so with a running open book account.

The trial judge relied upon 1 Cal.Jur. 2—"Accounts and Accounting," sec. 40, p. 363:

> "With respect to the allowance of interest, *accounts* ordinarily draw interest *only from the day on which they are settled and a balance is ascertained.* The provision of the Civil Code [note] that every person who is entitled to recover damages that are certain or capable of being made certain by calculation, the right to which is vested in him upon a particular date, may also recover interest thereon from that date, has no *application to actions to recover upon an open book* or mutual account that was never settled or balanced, or to the items of the account as they become due, even though the claim be for goods sold and delivered." (Emphasis appellants'.)

---

18″ from the tonghold) showed a crack, with a small related crack adjacent, and the section farthest away from the furnace (i. e. in the tonghold), and not affected by Forge's heating operation, showed no defects, with the unalterable conclusion that the defects were caused by, and emanated from Forge's mishandling in their heating process." (Isaacson's Br. pp. 37–39. Emphasis Isaacson's.)

Defendants-appellees correctly point out that the cases cited by Isaacson are contract cases, not open book account cases.

The trial court also cited Arocena v. Sawyer, 1923, 60 Cal.App. 581, 593, 213 P. 523; Sea v. Lorden, 1918, 37 Cal. App. 444, 445, 174 P. 85; and Heald v. Hendy, 1891, 89 Cal. 632, 635, 27 P. 67, which are all open book account cases. And see the dicta in Lineman v. Schmid, 1948, 32 Cal.2d 204, 209–211, 195 P.2d 408, 4 A.L.R.2d 1380.

We hold the trial judge correctly cited the California law here controlling.

B. The "Without Recourse" Agreement

 This without recourse agreement, urges Isaacson, means Forge was required to accept whatever was shipped to it, as steel—"without recourse."

If that had been the intent of the parties, why add the provision calling for an ultrasonic inspection? To agree to accept steel, without recourse, still requires the manufacturer to deliver steel, and not a substitute therefor—not pure slag, for example. Isaacson's "absolute" argument would render the dealings illusory. Isaacson recognizes this when it states it did not intend to ship material containing pipe or slag; or steel of a non-forging quality. The conduct of the parties [16] indicates Isaacson adopted, as it should have, a lesser position than a right to ship Forge anything it desired to ship—whether forgeable steel or non-forgeable steel.

Further, the written expression of Isaacson's understanding of the meaning of the term "without recourse"—and particularly the one sentence most emphasized by plaintiff-appellant Isaacson in Plaintiff's Exhibit 11, clearly discloses it was "every bit of hazard *connected with their use* [referring to "torching," "and several other major factors entering into proper handling"] was

yours"; meaning Forge's use of the steel.[17] To hold that Isaacson had no duty other than to deliver whatever conglomorate it desired, calling it marketable steel, would, as we stated, render the contract totally illusory. See Mattei v. Hooper, 51 Cal.2d 119, 330 P.2d 625 (1958).

We are satisfied that reason, the law, and *some* evidence (although the latter is in conflict), establishes the correctness of Finding 12.

■ C. We find no error in the lower court's finding there was no "account stated," (Count II) but rather that an open book account was kept and rendered.

As to all questions raised by plaintiff-appellant Isaacson, the judgment of the court below is affirmed.

Thus, the judgment below is affirmed in all respects.

16. Tr. p. 1038, line 17 to p. 1058, line 13.

17. We come to this conclusion despite some strong admissions (such as Forge's letter of November 30, 1955—Pl's. Ex.

12) that Forge "had no alternative but to abide by your (Isaacson's) decision," whatever that decision might be.